**[J-15-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| HOUSING AUTHORITY OF THE CITY OF PITTSBURGH, | : | No. 16 WAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| Appellant | : | Commonwealth Court entered |
| | : | November 20, 2023, at No. 1200 CD |
| | : | 2022, reversing the Order of |
| v. | : | Allegheny County Court of Common |
| | : | Pleas entered September 20, 2022, |
| | : | at No. LT-21-189 |
| DARLENE NASH, | : | |
| | : | ARGUED: April 8, 2025 |
| Appellee | : | |

**OPINION**

**JUSTICE DONOHUE**                                **DECIDED: SEPTEMBER 25, 2025**

In this appeal, the Housing Authority of the City of Pittsburgh[1] ("HACP") asks that this Court consider whether its lease agreement ("HACP Lease") permits it to evict a tenant who hosted a party at her leased residence ("Unit") where a third-party committed a fatal shooting. This issue requires us to examine the relevant provisions of the HACP Lease to determine whether HACP can evict a tenant under these circumstances. We conclude that HACP can evict on this basis and, therefore, we reverse the order of the Commonwealth Court.

---

[1] Under the Housing Authorities Law, Act of My 28, 1937, P.L. 955, *as amended*, 35 P.S. §§ 1541-1575, a "housing authority," such as HACP, is defined as a "public body and a body corporate and politic created and organized" for the purpose of, inter alia, providing federally subsidized housing to low-income individuals. 35 P.S. §§ 1542, 1543, 1550.

## I. Background

HACP leased the Unit located in the Northview Heights Complex[2] to Darlene Nash ("Nash") on or about May 4, 2017, through a signed lease agreement, i.e., the HACP Lease. Relevant to the instant matter, the HACP Lease requires a tenant "[t]o assure that no 'Covered Person'[3] engage in … [a]ny criminal activity on or off the Premises that threatens the health, safety, or right to peaceful enjoyment of any HACP community by members of the Household, Guests, other Tenants or employees of HACP … ." HACP Lease, § 9(K). Further, it is considered "a material breach of Tenant's Lease and specific grounds for termination of [the HACP Lease] if any 'Covered Person' … [s]hoot[s], fire[s], explode[s], throw[s] or otherwise discharge[s] a potentially deadly weapon, or … [i]nflict[s] ... any injury upon another person through the intentional use of a deadly weapon, or by the reckless or negligent use of such weapon ... ." *Id.* § 9(M)(2)-(3).

On January 9, 2021, Nash celebrated her fifty-ninth birthday in her Unit with a party organized by herself and some friends. Nash and her goddaughter, who provided the only other substantive testimony on Nash's behalf at trial, testified that numerous people attended the party, some staying for a short period of time and others remaining for a longer period of time. Although there were no formal invitations sent out, there was testimony indicating that one or more guests had announced the party on social media, which led more people in the community to attend the party at Nash's Unit. Among them

---

[2] Northview Heights Complex is a residential housing complex consisting of 450 apartments managed by HACP. HACP, *Northview Heights*, https://hacp.org/housing_communties/northview-heights/ (last visited 9/22/2025). Northview Heights participates in the public housing program under the authority of the Department of Housing and Urban Development ("HUD"), in which eligible low-income tenants are provided property-based subsidies. 55 Pa. Code § 291.22.

[3] The HACP Lease provides that "Covered Person: means any Tenant, any members of Tenant's Household, a Guest or Other Person under the Tenant's Control ... ." HACP Lease, § 2(C).

was a juvenile male individual ("Shooter")[4] who frequented the residence next door to Nash's Unit where the mother of his child lived, often spending the night there. Nash testified that she had known Shooter and his family for years and that he had previously been welcomed into her home on several occasions, and had, on at least one occasion, showered in her Unit and left belongings there. N.T., 5/25/2022, at 81-82.

Throughout the duration of Nash's party, people would enter her Unit, including Shooter, offer their congratulations to Nash, enjoy some cake and stay for a period of time. As Nash indicated, nobody who entered her Unit during the party was told that they were unwelcome or was asked to leave, except for Blake Green ("Green"). Green was initially welcomed to the party; however, Nash eventually asked him to leave "because he was starting with somebody[.]" *Id.* at 88. Approximately twenty minutes later, Green returned to the Unit. Nash attempted to explain to Green that they were cleaning up the party and continued to ask him to leave. At approximately 10:30p.m., as Green was departing from the Unit, he was shot and killed. Nash suffered injuries from being grazed by a bullet, as well. Afterwards, Nash instructed others to remove Green's body from her Unit out of fear that the shooting would lead to her eviction from Northview Heights. Because Green was positioned between Nash and Shooter, Nash testified that she could not see who shot Green. However, Pittsburgh Police Detective Joseph Fabus testified that officers recovered bullet casings inside the Unit and "slugs" in the carpet inside of the Unit. Although it has not been confirmed that Shooter indeed was the one who pulled the

---

[4] Although there have not been any convictions, charges or arrests made with respect to the fatal shooting relevant to the underlying case, the juvenile was identified as the main suspect by police during the trial. N.T., 5/25/2022, at 46-47. Due to his age at the time of the incident, the juvenile's identity has never been disclosed throughout the proceedings. However, at all stages of these proceedings, the juvenile individual has been treated as the shooter for purposes of the lower courts' analyses, and throughout their briefing the parties appear to concede for purposes of their arguments that Shooter was the one involved in the fatal shooting inside of Nash's Unit. For these reasons, we shall refer to the juvenile individual as Shooter throughout.

trigger, *see* supra note 4, Fabus' testimony established that Shooter was a suspect and that Shooter has been on the run since the time of the shooting.

On or about March 1, 2021, HACP served Nash with a notice to terminate her lease, referencing the January 9, 2021 shooting by a "Covered Person" and further referenced an "Unauthorized Occupant"[5] in the Unit. Specifically, HACP contended that Shooter was an "Unauthorized Occupant" and that, as a "Covered Person," Shooter had committed a crime in violation of the HACP Lease's provisions pertaining to "criminal activity" and "discharge of a potentially deadly weapon." HACP's Lease Termination/Vacate Notice, 3/21/2021. Because Nash did not vacate the Unit, HACP initiated this eviction proceeding in the Magisterial District Court on April 7, 2021. The Magisterial District Court granted HACP possession of the Unit, permitting HACP to proceed with the eviction. Following Nash's appeal to the Allegheny County Court of Common Pleas, HACP filed its complaint. An arbitration panel was later convened, and

---

[5] Only those specifically approved by HACP may reside in the Unit. HACP Lease, § 1(D). However, there are certain exceptions for the accommodation of a tenant's guests:

> That the exclusive use and occupancy of the dwelling Unit shall include accommodations of the Tenant's Guest or visitors for no more than fourteen (14) consecutive days and no more than 60 total days in a one year period for any individual guest. The Tenant shall, within two (2) business days, given written notice or notice in an alternative format to the site manager of any person who stays for more than five (5) days in the Unit. The notice shall include the name, address, and vehicle identification of a person who stays five (5) working days or more. The Tenant may make special arrangements with the site manger for an extended stay of guest when allowing another non-Tenant adult to care for the Tenant's children or due to other extenuating circumstances. The Tenant is responsible for the conduct of all Guests and visitors.

*Id.* § 9(F). Should an individual remain in the Unit beyond the time set forth in the lease and not receive HACP approval, they will be considered an Unauthorized Occupant, which can be a material breach of the HACP Lease. *Id.* § 1(D).

it ruled in HACP's favor on August 19, 2021. Nash then timely appealed the arbitration panel's decision. On May 25, 2022, the Honorable Patrick M. Connelly held a non-jury trial at which time both HACP and Nash presented evidence regarding whether Shooter was an "Unauthorized Occupant" and/or a "Covered Person" for whom Nash would be liable under the HACP Lease.

In his memorandum opinion, Judge Connelly first determined that in light of the evidence presented, HACP failed to establish that Shooter resided in Nash's Unit, such that he could be considered an Unauthorized Occupant under the lease. Trial Court Op., 6/8/2022, at 5-6. However, with respect to the killing of Green on January 9, 2021, the trial court concluded that Shooter was a "Covered Person" pursuant to the HACP Lease and that his conduct violated several provisions of it. *Id.* at 6. The trial court found that the fatal shooting clearly constituted "criminal activity" that involved discharging "a potentially deadly weapon" and disturbed the peaceful enjoyment of other tenants. *Id.* at 6-7. Acknowledging that Nash's obligations under the HACP Lease turned on the conduct of a "Covered Person," the trial court proceeded to explain that a "Covered Person" could be one of the following: 1) a "Tenant," 2) a "member of Tenant's Household," 3) a "Guest" or 4) "Other Person Under the Tenant's Control" ("OPTC"). *Id.* at 7. The trial court first noted that Shooter was neither the Tenant nor a member of Tenant's Household. Further, the trial court concluded that Shooter was not a Guest, based on the HACP Lease's definition of the term.[6] Thus, the court was left to determine whether he was an OPTC. *Id.* at 7-8.

The trial court recognized that the HACP Lease defines "OPTC" as "a person, although not living as a Guest in the Unit who is, or was at the time of the activity in

---

[6] The HACP Lease defines "Guest" as "a person temporarily living in the Unit with the consent of the Tenant or other member of the Household who has express or implied authority to consent on behalf of the Tenant." HACP Lease, § 2(I). The trial court previously decided that HACP failed to establish that Shooter resided in Nash's Unit.

question on the Premises, as defined below, because of an invitation from Tenant or another member of the Household[.]" *Id.* at 8. The court found that because Nash held an "open house" party,[7] i.e., an open invitation to all, she "assumed the risk of [her] guests' misbehavior." *Id.* at 8-9. As established at trial, Shooter was known to have arrived at the party for a short time and, even if unannounced, was a treated as a welcomed guest. *Id.* Because Shooter was there per Nash's "open house" invitation at the time of the activity in question the trial court concluded that Shooter "was indeed an OPTC and accordingly, that Nash violated the terms of [the HACP Lease.]" *Id.* at 9. Accordingly, the trial court awarded possession of the Unit to HACP. *Id.*

Nash filed a post-trial motion on June 17, 2022, which was denied on September 20, 2022. She then appealed to the Commonwealth Court. On appeal, Nash argued that Shooter could not be a "Covered Person" because although he may have been invited into her Unit, he had not been invited "on the Premises" by Nash, and thus the invitation to her Unit was distinct from an invitation to be "on the Premises." The Commonwealth Court agreed.

In a unanimous, unpublished decision, the Commonwealth Court reversed the trial court's decision. *HACP v. Nash*, 2023 WL 8009066 (Pa. Commw. Nov. 20, 2023). The Commonwealth Court reasoned that the trial court conflated the term "Premises" with "Unit," emphasizing that an invitation to enter a Unit is different than an invitation to enter the Premises. *Id.* at *3-*4. The court explained that the HACP Lease defined "Premises" as "the building, or complex, or development in which the Unit, as defined below, is located, including Common Areas and grounds." *Id.* at *3 (citing HACP Lease, § 2(M)). On the other hand, "Unit" is defined as "the dwelling space intended for the exclusive use

---

[7] In support of this understanding, the trial court looked to dictionary definitions of "open house." *See Open house*, MERRIAM-WEBSTER ONLINE ("ready and usually informal hospitality or entertainment for all comers").

of and occupation by the Household" and "shall include any steps, porch, hallway, lawn, or yard adjacent to and reasonably considered to be part of the dwelling space." *Id.* (citing HACP Lease, § 2(R)). To find as the trial court did, the Commonwealth Court determined that the trial court had to treat Premises and Unit as synonymous terms. *Id.* The Commonwealth Court reasoned that although Shooter was in the Unit when the incident took place, HACP had not established that he was on the Premises per Nash's invitation. *Id.* Further, the Commonwealth Court opined that the party's open-ended nature decreased the likelihood that Shooter was on the Premises due to Nash's invitation, particularly in light of the fact that his girlfriend and their child lived next door. *Id.* Additionally, the court found that the HACP Lease "does not support the theory that a person's movement from one unit to another changes the identity of the one who invited the person to the Premises[,]" such "that when a person is on the Premises at the invitation of tenant-A but then goes to tenant-B's unit, that person becomes the responsibility of tenant-B." *Id.* at *4.

HACP timely filed a petition for allowance of appeal, which we granted to consider the following question:

> Whether a Public Housing Authority is precluded from evicting a tenant who invites a person into their Unit and the invitee commits a homicide inside that Unit because the invitee had purportedly been invited earlier to a different Unit on the Premises?

*HACP v. Nash*, 320 A.3d 669 (Pa. 2024) (per curiam).

## II.     Parties' Arguments

**HACP's Arguments**

HACP argues that the Commonwealth Court misinterpreted the lease language by finding that Shooter was not a Covered Person, specifically not an OPTC, under the lease. HACP's Brief at 14. It contends that there is no legitimate basis to differentiate between

Premises and Unit, as that language is set forth in all public housing leases pursuant to federal law and regulations, and that to do so would lead to absurd results. *Id.* at 14-16 (citing 24 C.F.R. § 966.4). To HACP, the terms are not synonymous but Unit is necessarily part of the Premises and, thus, even if someone arrives on the Premises for a different purpose, once they are invited into a Unit they are under that tenant's control. *Id.* at 19-20. HACP argues that absurdity would ensue if, as the Commonwealth Court surmised, all that matters for purposes of ascertaining which tenant is responsible for an OPTC is who first invited them onto the Premises. *Id.* at 21. This would mean, according to HACP, that a bad actor could be invited onto the Premises by Tenant A where they commit no misconduct, and then—while still on the Premises—be invited to a separate Unit by Tenant B for the express purpose of committing misconduct. *Id.* at 20-21. HACP points out that there could be no repercussions for Tenant B under the Commonwealth Court's rationale because all that matters is who extended the initial invitation to the bad actor. *Id.* at 21-22.

Further, HACP argues that the Commonwealth Court's interpretation is "in direct conflict with the governing standard of review," wherein the appellate court is to review the evidence "in a light most favorable to HACP as the verdict winner and **all reasonable inferences** decided in its favor." *Id.* at 22-23 (emphasis in original). According to HACP, the trial court found that there was sufficient evidence that Nash invited Shooter to "at a minimum" remain on the Premises by welcoming him to enter her Unit for the birthday party when the fatal shooting took place. *Id.* at 23. HACP notes that the Commonwealth Court opined that it was more likely that Shooter was on the Premises at his girlfriend's invitation, despite there being no evidence in the record to support that his girlfriend invited him onto the Premises that day. *Id.* at 24. HACP highlights that the intermediate appellate court inferred that because Nash's "open house" party had no formal invitations,

this made it less likely that Shooter was on the Premises because of the party and making it more likely that he was there to visit the mother of his child next door. *Id.* HACP argues that the inference is contrary to the trial court's fact finding. Moreover, an invitation into a Unit must equate to an invitation to be on or remain on the Premises, because Premises encompasses and includes Units. *Id.* at 24-25.

**Nash's Arguments**

Nash concedes that a "Covered Person," such as an OPTC, can violate the HACP Lease by committing a violent criminal act. Nash's Brief at 7. However, it is her position that Shooter cannot be considered an OPTC because he had to have been "on the Premises … because of an invitation from Tenant or another member of the Household[.]" *Id.* at 7-8. This distinction between the "Premises and the Unit" is crucial to Nash, who argues that the trial court invented the "open house" rule, which effectively "relieve[s] [HACP] of the obligation to prove that the alleged Covered Person who committed a crime was on the Premises because of an invitation from the Tenant." *Id.* at 9. To her, this "open house" concept has no support in either case law or the lease itself. *Id.*

Nash contends that holding a tenant liable for third-party actions, as set forth by federal law, is meant to prevent criminals from being invited onto the Premises when they "would not otherwise be at the public housing complex," but for some tenant's invitation into the community. *Id.* at 14. In tracing the history of the federal policy, Nash highlights that this third-party strict liability was initially meant to curb the illegal drug trade and other violent criminal acts from taking place on public housing property. *Id.* at 11-12 (citing 42 U.S.C. § 11901). Nash contends that such policies exist because while there are tenants who invite bad actors onto the Premises and may not be responsible for criminal acts themselves, "they are responsible for exposing the community to this criminality on

account of inviting these guests onto the premises of public housing complexes." *Id.* at 13.

Although Nash admits to knowing Shooter and previously welcoming him into her Unit, it is her position that the evidence "strongly suggested" that Shooter was on the Premises to visit his girlfriend next door, "not due to any invitation" from Nash herself. *Id.* at 14. She asserts that the trial court tacitly acknowledged that it could not make this determination based on the evidence, but found the "open house" concept to be sufficient to have her assume liability for anyone who came through her doors. *Id.* at 15-16. Nash finds this "open house" rule to be at odds with the underlying motivation for third-party liability in public housing leases. *Id.* Instead, she argues, the inquiry must be focused on why the bad actor is on the Premises in the first place. *Id.* at 18.

## III. Analysis

In this matter we must determine whether Nash violated the HACP Lease as a result of Shooter's commission of a criminal act in her Unit. In so doing, we construe various provisions of the HACP Lease. Interpretation of a lease agreement, like the interpretation of any contract, is a question of law, and thus our standard of review is de novo and our scope of review is plenary. *Mace v. Atl. Refin. & Mktg. Corp.*, 785 A.2d 491, 492 n.5 (Pa. 2001). However, "[w]hen this Court entertains an appeal originating from a non-jury trial, we are bound by the trial court's findings of fact, unless those findings are not based on competent evidence." *McShea v. City of Phila.*, 995 A.2d 334, 338-39 (Pa. 2010) (citing *Triffin v. Dillabough*, 716 A.2d 605, 607 (Pa. 1998)).

First, we must determine whether the underlying conduct is prohibited under the HACP Lease. If the conduct is prohibited, then we proceed to decide whether Shooter is a "Covered Person" under the lease. Should he be considered a "Covered Person," then Nash will be strictly liable for his conduct, resulting in the termination of her tenancy and

eviction from the Premises. Her own innocence with respect to Shooter's conduct has no bearing on our determination. Both HACP and Nash agree on this point. HACP's Brief at 16 & n.5; Nash's Brief at 10-12 (noting that the lease provisions impose "strict liability on a tenant for the conduct of third parties of which the tenant may not have even had knowledge"). This is what has come to be known in landlord-tenant law as a "no-fault eviction," which is when a tenant is not at fault for the violative conduct and/or had no knowledge that such misconduct would occur, but nevertheless is subject to a strict liability eviction. *See* Gerald S. Dickinson, *Towards a New Eviction Jurisprudence*, 23 GEO. J. ON POVERTY & POL'Y 1, 20 (2015). A policy that became widespread in the federal public housing sector during the Clinton administration,[8] no-fault evictions were upheld as constitutional by the United States Supreme Court in 2002, at least with respect to drug-related offenses. *See Dep't of Hous. and Urb. Dev. v. Rucker*, 535 U.S. 125, 134 (2002).

In *Rucker*, four public housing tenants of the Oakland Housing Authority in California faced eviction for incidents in which a family member or guest was convicted of drug-related criminal activity somewhere off of the premises. *Id.* at 128. The United States Housing Act of 1937 requires HUD to promulgate regulations that mandate that local public housing authority ("PHA") leases

---

[8] The no-fault strict liability eviction policy is commonly referred to as the "one-strike policy" following President Clinton's public statements: "If you break the law, you no longer have a home in public housing, one strike and you're out. That should be the law everywhere in America." President Clinton's Remarks Announcing the "One Strike and You're Out" Initiative in Public Housing, 32 WEEKLY COMP. PRES. DOC. 582-84 (Apr. 1, 1996).

The policy came about following Congress' 1988 enactment of the Anti-Drug Abuse Act, in an effort to address concerns over crime that would threaten the health, safety, or right to peaceful enjoyment of the communities as well as drug dealers "reign of terror on public and other federally assisted low-income housing." Dickinson, supra, at 3 n.3 (citing 42 U.S.C. § 1437, *amended*).

provide that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy[.]

42 U.S.C. § 1437d(l)(6). The tenants in *Rucker* argued that Section 1437d violated their due process rights because they "did not know, could not foresee, or could not control behavior by other occupants." *Rucker*, 535 U.S. at 129. The High Court found that Section 1437d is unambiguous and requires PHA leases to "vest local [PHAs] with the discretion to evict tenants for the drug-related activity of household members and guests whether or not the tenant knew, or should have known, about the activity." *Id.* at 130. The High Court also found that the use of the term "other person under the tenant's control" simply meant that "the tenant has permitted access to the premises" to the individual, even in a single instance. *Id.* at 131. As a result, the Court found that it was up to the PHAs' discretion whether to evict under such circumstances, "without regard to the tenant's knowledge" of the prohibited activity. *Id.* To the High Court, "it was reasonable for Congress to permit no-fault evictions in order to 'provide public and other federally assisted low-income housing that is decent, safe, and free from illegal drugs[.]" *Id.* at 134.[9]

---

[9] Since the *Rucker* decision, many scholars have been critical of the High Court's decision, citing the negative consequences this policy has had on low-income residents in subsidized housing. *See, e.g.*, Robert Hornstein, *Litigating Around the Long Shadow of Department of Housing and Urban Development v. Rucker: The Availability of Abuse of Discretion and Implied Duty of Good Faith Affirmative Defenses in Public Housing Criminal Activity Evictions*, 43 U. TOL. L. REV. 1 (2011) ("The *Rucker* decision impacts some of the poorest and most vulnerable American families, many of which are headed by single women."); Gerald S. Dickinson, *Towards a New Eviction Jurisprudence*, 23 GEO. J. ON POVERTY & POL'Y 1, 20 (2015) ("The unusually harsh punitive measures imposed by the One-Strike Rule impacts women and children the most."); Lahny R. Silva, *Collateral Damage: A Public Housing Consequence of the "War on Drugs,"* 5 UC Irvine L. Rev. 783 (2015) ("In light of the Supreme Court's upholding no-fault evictions in *Rucker*, scholars (continued…)

While we have never directly addressed the validity of the strict liability eviction policy in federally subsidized housing in Pennsylvania—and are not asked by the parties to do so today—this Court has acknowledged *Rucker*'s holding that no-fault evictions for third-party misconduct cannot be overcome by a tenant's innocence. *See HACP v. Fields*, 816 A.2d 1099, 1099 (Pa. 2003) (per curiam order reversing Commonwealth Court's decision to refuse eviction based on a tenant's lack of knowledge, pursuant to the High Court's decision in *Rucker*). Although *Rucker* involved no-fault evictions for illegal drug activity, the relevant regulations and lease provisions apply the same conditions and consequences to prohibited third-party violent activity, as well.[10] Thus, there is no reason

---

and advocates are developing creative legal arguments to level the playing field between public housing tenants and the enormous discretion of the PHA.").

[10] It should be noted, however, that in 1995 the Pennsylvania Legislature drafted an "innocent tenant defense" for evictions sought pursuant to the Expedited Eviction of Drug Traffickers Act, Act of October 11, 1995, P.L. 1066, *as amended* 35 P.S. §§ 780–151-780–179. Dickinson, supra, at 36. Specifically, pursuant to the Expedited Eviction of Drug Traffickers Act:

> **(a) Affirmative defense.--**The court may refrain from ordering the complete eviction of a tenant under section 6(a), if the tenant has established that the tenant was not involved in the drug-related criminal activity and that the tenant:
>
> (1) did not know or have reason to know that drug-related criminal activity was occurring on or within the individual rental unit, that the individual rental unit was used in any way in furtherance of or to promote drug-related criminal activity or that any member of the tenant's household or any guest has engaged in drug-related criminal activity on or in the immediate vicinity of any portion of the leased residential premises;
>
> (2) had done everything that could reasonably be expected in the circumstances to prevent the commission of the drug-related criminal activity; or

(continued…)

not to apply this same understanding of no-fault evictions to the instant matter. Given the parties' agreement with this paradigm, should we find the lease provisions apply under these circumstances, then Nash is subject to the policy of no-fault eviction.

Nash's Unit is designated as public housing. Under the public housing paradigm, the federal government provides financial subsidies so that local PHAs, like the HACP, may administer and manage housing for low-income residents at rents they can afford.[11] Pennsylvania law requires PHAs "[t]o cooperate with and act as agent of the Federal Government for," inter alia, "operation or management of any housing project," 35 P.S. § 1550, and by accepting these funds, PHAs are required to "comply with such conditions … as may be necessary," 35 P.S. § 1562. As such, federal law mandates that certain provisions be utilized in PHA lease agreements. 42 U.S.C. § 1437d(l). As relevant here, all PHA leases mandate that tenants must "assure that no other person under the tenant's control engaged in … [a]ny criminal activity that threatens the health, safety or right to peaceful enjoyment of the premises by other residents[.]" 24 C.F.R. § 966.4(f)(12)(i)(A)(1). The federal regulations also provide that PHA leases

> must provide that any criminal activity by a covered person that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including PHA management staff residing on the premises) or threatens the health, safety, or right to peaceful enjoyment of their

---

> (3) had promptly reported the drug-related criminal activity to appropriate law enforcement authorities.

35 P.S. § 780–157(a). This defense is limited to evictions sought pursuant to the Expedited Eviction of Drug Traffickers Act, and there is no analogous affirmative defense for third-party violent criminal activity.

[11] *See* HUD, *HUD's Public Housing Program*, https://www.hud.gov/helping-americans/public-housing#:~:text=Public%20housing%20was%20established%20to,rise%20apartments%20for%20elderly%20families. (last visited 9/22/2025).

residences by persons residing in the immediate vicinity of the premises is grounds for termination of tenancy.

24 C.F.R. § 966.4(l)(5)(ii)(A). Pursuant to this provision, a PHA has the discretion to enforce no-fault evictions. The parties agree that this lease agreement and HACP are subject to the federal law and regulations. *See* HACP's Brief at 14 (noting that PHA "lease language … is dictated by federal law and regulations"); Nash's Brief at 10 ("These provisions are mandated by law in all federal public housing leases[.]")

Consistent with the federal mandate, the HACP Lease at issue contained the following provisions:

> As with the failure to comply with other Tenant obligations under this Lease, the failure to comply with any provisions contained in this section shall be considered a material breach of the Lease and cause for eviction. Tenant agrees:
>
> \*  \*  \*
>
> K. To ensure that no "Covered Person" engages in:
>
>> 2. Any criminal activity on or off the Premises that threatens the health, safety, or right to peaceful enjoyment of any HACP community by members of the Household, Guests, other Tenants or employees of HACP, or persons residing in the immediate vicinity of the Premises.
>
> \*  \*  \*
>
> M. It shall be considered a material breach of [the HACP Lease] and specific grounds for termination of this Lease if any "Covered Person" does any of the following in the Unit or on the Premises:
>
>> 2. Shoot, fire, explode, throw, or otherwise discharge a potentially deadly weapon; or
>>
>> 3. Inflict, without legal justification, any injury upon another person through the intentional use of a deadly weapon, or by the reckless or negligent use of such weapon;

\* \* \*

8. Displays, uses or possesses any illegal firearms, (operable or inoperable) or other illegal weapons as defined by the law and courts of the Commonwealth of Pennsylvania anywhere on the property of HACP.

HACP's Lease, § 9(K), (M).

It is undisputed that the fatal shooting took place in Nash's Unit on January 9, 2021. Undoubtedly, criminal homicide constitutes "criminal activity" that "threatens the health, safety, or right to peaceful enjoyment" of the rest of the community. *Id.* § 9(K)(2). Further, the use of a deadly weapon would also be considered a material breach under the lease. *Id.* § 9(M). Based on the undisputed facts that a fatal shooting took place in Nash's Unit on January 9, 2021, we have no doubt that the conduct itself would rise to the level of a material breach of the HACP Lease. Therefore, the only pertinent question about the propriety of the termination of Nash's lease is whether Shooter was a "Covered Person" under the HACP Lease.

As defined in the HACP Lease, a "Covered Person" means "[(1)] any Tenant, [(2)] any members of Tenant's Household, [(3)] a Guest or [(4)] [OPTC][.]" HACP Lease, § 2(C). Neither party asserts that Shooter was a Tenant or an authorized member of Tenant's household. Thus, Shooter would either have to be considered a Guest or an OPTC to hold Nash responsible for his actions under the HACP Lease. A Guest is "a person temporarily living in the Unit with the consent of the Tenant or other Member of the Household who has express or implied authority to consent on behalf of the Tenant." *Id.* § 2(I). The trial court held that Shooter was not an unauthorized occupant,[12] which was never appealed, and thus, any evidence to suggest Shooter was authorized to be on the Premises as Nash's Guest (e.g., showers, stored bags, staying overnight) is not

---

[12] *See* supra note 5.

relevant to our current discussion. The sole remaining question is whether Shooter was an OPTC.

The HACP Lease defines "OPTC" as "a person, although not living as a Guest in the Unit, who is, or was at the time of the activity in question on the Premises ... because of an invitation from Tenant or another member of the Household who has express or implied consent on behalf of Tenant." HACP Lease, § 2(L). To determine whether Shooter was an OPTC, we focus on whether he was "a person … who is, or was at the time of the activity in question on the Premises … because of an invitation from Tenant[.]" *Id.*

Based on the evidence presented to the trial court, there is no dispute that Shooter was present in Nash's Unit at the time of the activity in question, i.e., the fatal shooting of Green. Although Nash concedes that the shooting took place in her **Unit**, she argues that Shooter cannot be considered an OPTC because Nash was not the reason that Shooter was "on the **Premises**" at the time of the shooting. *Id.* (emphasis added). While the Commonwealth Court agreed with this line of reasoning, we do not.

We recognize that the HACP Lease treats Unit and Premises as two distinct terms, used and defined separately. The HACP Lease defines "Premises" as "the building, or complex, or development in which the Unit, as defined below, is located, including Common Areas and grounds." *Id.* § 2(M). "Unit" is defined as "the dwelling space intended for the exclusive use and occupation by the Household. The Unit shall include any steps, porch, hallway, lawn, or yard adjacent to and reasonably considered to be part of the dwelling space." *Id.* § 2(R). Here, Premises would be understood to mean the entire Northview Heights Complex, whereas Unit would refer strictly to Nash's "dwelling space."

By definition, Units are undeniably **part** of the Premises. Specifically, Units are the portions of the Premises that are under a tenant's control, pursuant to the terms of the lease agreement. HACP Lease, § 1(A). And yet, Nash and the Commonwealth Court divorce the Unit from the Premises in which it is located. As the Commonwealth Court explained its rationale, "[a]n invitation to enter a Unit is not the same as an invitation to enter the Premises." *Nash*, 2023 WL 8009066, at *4. We find this reading to be absurd. An invitation to a Unit **is** an invitation to the Premises, because the Unit **is part of the Premises**. Nash and the Commonwealth Court would have us focus on the chronology of events, making the only relevant inquiry be who is responsible for inviting this bad actor to Northview Heights in the first place. Nash's Brief 13-15; *Nash*, 2023 WL 8009066, at *4.

For the sake of discussion, if we accepted this argument and Shooter's girlfriend extended the initial invitation to Shooter, we know that he would have been invited to her Unit. Under this rationale, Shooter's girlfriend's Unit would be the only location considered to be part of the Premises, whereas Nash or any other tenant's Unit would not be considered part of the Premises merely because of the timing of an invitation. Aside from being an absurd reading of the HACP Lease, this position would also require us to rewrite the lease. Nash and the Commonwealth Court read the definition of OPTC as someone "who receives the initial invitation to the Premises by Tenant." That is not what the lease provides. Although there may be a reasonable inference that Shooter was originally on the Premises to visit the mother of his child in the Unit next door to Nash's Unit—as he purportedly did most days—the temporal qualifier that is actually included in the definition for an OPTC is what controls our analysis: "at the time of the activity in question[.]" HACP Lease, § 2(L). This language requires us to look to **when** the actual

misconduct occurred.[13]  Here, the misconduct took place when Shooter was in Nash's Unit.  The lease does not preclude a finding that a Tenant is in breach of the lease when a third-party commits violative conduct in the Tenant's Unit merely because the perpetrator was originally invited to another Unit.  A Unit is necessarily part of the Premises, and therefore an invitation to a Unit is an invitation to the Premises.  This also means that an invitation from one Unit on the Premises to another Unit is an invitation to stay or remain on the Premises.

The final part of our analysis is whether Shooter was in Nash's Unit "**because of an invitation**[.]"  HACP Lease, § 2(L).  If Shooter was in Nash's Unit "because of an invitation" from her, then all components of the OPTC definition have been established.  Nash testified that she only invited a handful of individuals to her Unit directly and had no knowledge of the social media posting regarding the party until the next day. N.T., 5/25/2022, at 84-86.  However, the trial court did not find that her testimony detracted from its conclusion that she hosted an "open house" party.  Trial Court Memorandum Opinion, 6/8/2022, at 8-9.  The testimony suggested that it was a common enough practice for individuals in the community to arrive at a Unit unannounced to wish happy birthday and enjoy some food.  N.T., 5/25/2022, at 87-88; 101-04.  This was precisely what took place at Nash's party.  From this evidence, the trial court "glean[ed] that the arrival of any given individual was unknown until he or she appeared," but that anyone who did arrive would be "greeted as a welcome visitor."  Trial Court Opinion, 6/8/2022, at 8-9.  Shooter was among those who came to the Unit during the party to take a piece of cake and wish Nash a happy birthday.  N.T., 5/25/2022, at 87-88; 104.  The only guest expressly told to leave was Green.  *Id.* at 88.  With all other attendees being treated as

---

[13]  It may be that multiple tenants could be responsible for a third party's misconduct that jeopardizes the health, safety, and peaceful enjoyment of the Premises. That question is not before us.

welcomed guests at Nash's party, the trial court's conclusion that Nash was hosting an "open house" party was reasonably supported by the evidence. *McShea*, 995 A.2d at 338-39 (citing *Triffin*, 716 A.2d 605)).

Nash contends that the trial court created this "open house" rule, and thus it cannot be considered an invitation, as set forth in the HACP Lease. We do not view the trial court's findings as the creation of a new rule, but rather a straightforward application of the lease provision. In determining whether Shooter was invited, the trial court merely identified the manner of invitation in light of the evidence presented. For purposes of the HACP Lease, it does not matter whether the invitation is express or implied. Here, the trial court found that Nash extended an "open house" invitation. If all are welcome, then all are effectively invited per Nash's consent. The evidence indicated that she took deliberate steps to remove Green from the Unit. No such efforts were taken with regard to Shooter, as he was, in fact, permitted—implicitly or otherwise—to remain in Nash's Unit as part of the celebration. As partygoers including Shooter were still in attendance at the time of the shooting, all those remaining in Nash's Unit were present per her "open house" invitation.[14]

Based on the above discussion, Shooter was in Nash's Unit at the time of the activity in question because of an invitation from Nash. Thus, pursuant to the HACP Lease, he was an OPTC when he committed the fatal shooting in Nash's Unit. This is a material breach of the HACP Lease, and HACP may terminate Nash's tenancy on this

---

[14] There was testimony from Nash's goddaughter that Shooter left shortly after receiving a piece of cake. N.T., 5/25/2022, at 55-56. That would mean that Shooter left and returned to Nash's Unit prior to the shooting. We do not believe that his departure and subsequent return negate the effect of Nash's invitation. She had not sent out explicit invitations with any details regarding who was invited or what time the party would end. Given that Shooter was welcomed upon his first appearance to the Unit, there would be no reason to believe without evidence to the contrary that he would be treated as unwelcome upon his return while the party was still ongoing.

basis. By virtue of federal law and the provisions that it mandates be included in the HACP Lease, the answer is clear. The violative conduct of a "Covered Person" may serve as the basis for HACP to seek termination of a tenant's HACP Lease. This policy effectively requires PHA tenants to self-police and regulate the conduct of those individuals that legally fall under their control. By inviting Shooter into her Unit, Nash accepted responsibility for his actions, pursuant to the HACP Lease. Accordingly, Nash violated the terms of her lease agreement and the trial court properly awarded possession of the Unit to HACP.

## IV. Conclusion

For the foregoing reasons, we reverse the decision of the Commonwealth Court.

Chief Justice Todd and Justices Mundy, Brobson and McCaffery join the opinion.

Justice Wecht files a dissenting opinion in which Justice Dougherty joins.